# NO. 06-13-00223-CR

RECEIVED IN
The Court of Appeals
Sixth District

DEC 2 9 2014
*R.9.2(b)*
Texarkana, Texas
Debra Autrey, Clerk

## IN THE COURT OF APPEALS

## SIXTH DISTRICT

## TEXARKANA, TEXAS

FILED IN
The Court of Appeals
Sixth District

DEC 29 2014

Texarkana, Texas
Debra Autrey, Clerk

## JESSICA NICOLE NANCE, APPELLANT

## V.

## THE STATE OF TEXAS, APPELLEE

## MOTION FOR REHEARING IN CAUSE NUMBER CR 1101695

## IN THE COUNTY COURT AT LAW NO. 1

## OF HUNT COUNTY, TEXAS

## MOTION FOR REHEARING

## BRIEF

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

Comes Now the Appellant and submits this Motion for Rehearing pursuant to the provisions of the Texas Rules of Appellate Procedure in Support of her request for the judgment of conviction to be overturned in Cause CR 1101695.

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1, the undersigned counsel of record certifies that the following persons have an interest in the outcome of this case. These representations are made so that the Justices of this Honorable Court can evaluate whether they are disqualified to serve or should recuse themselves from participation in the decision of this case.

**APPELLATE :**

Jessica Nicole Nance

PO. Box 211362

Bedford, Texas 76095

**APPELLATE ATTORNEY:**

Jason A. Duff

2615 Lee Street

P.O. Box 11 Greenville, Texas 75403

**Appellee:**

The State of Texas by and through

Joel D. Littlefield

Jeffery Kovach

Hunt County Attorney

4th Floor Hunt County Courthouse

2500 Lee Street

Greenville, Texas 75401

# TABLE OF CONTENTS

Identity of the Parties and Counsel

Table of Contents

Index of Authorities

Statement of the Case

Issues Presented

Statement of the Facts

Summary of the Argument

Prayer for Relief

Certificate of compliance of typeface and word count

Certificate of Service

## INDEX OF AUTHORITIES

### CASES

Brooks v. State, 323 S.W.3d 893

(Tex.Crim.App. 2010)

Clayton v. State, 235 S.W.3d 772

(Tex.Crim.App. 2007)

Gilliand v. State, 2011 WL 3862861

(Tex.App.—Texarkana 2011)

Hartsfield v. State, 305 S.W.3d 859

(Tex.App.—Texarkana 2010)

Hooper v. State, 214 S.W.3d 9

(Tex.App.—Texarkana 2007)

Jackson v. Virginia, 433 U.S. 307 (1979)

Johnson v. State, 517 S.W.2d 536

(Tex.Crim.App.1975)

Gonzales v. State, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012)

Haynes v. State, 475 S.W.2d 739, 741 (Tex. Crim. App. 1971)

Kentucky v. King, 131 S.Ct. 1849, 1856 (2011)

Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967))

Gonzales, 369 S.W.3d at 854

Bray v. State, 597 S.W.2d 763, 765 n.1 (Tex. Crim. App. [Panel Op.] 1980) (quoting McDonald v. United States, 335 U.S. 451, 455 (1948))

Johnson v. United States, 333 U.S. 10, 17 (1948)

Jones v. United States, 357 U.S. 493, 499 (1958).

McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).

Hudson v. State, 588 S.W.2d 348, 351 (Tex. Crim. App. 1979) (quoting United States v. Chadwick, 433 U.S. 1, 9 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 568–80 (1991) (internal quotation marks omitted)).

United States v. Martinez–Fuerte, 428 U.S. 543, 565 (1976); see also Beck v. Ohio, 379 U.S. 89, 96 (1964)

Clay v. State, 391 S.W.3d 94, 100 n.21 (Tex. Crim. App. 2013)

(quoting Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.3(b), at 511 (4th ed. 2004))).

State v. Robinson, 334 S.W.3d 776, 778–79 (Tex. Crim. App. 2011) (footnotes omitted)

Robinson, 334 S.W.3d at 780 (Cochran, J., concurring); Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Robinson, 334 S.W.3d at 779; Amador v. State, 221 S.W.3d 666, 672–73 (Tex. Crim. App. 2007).

Bray, 597 S.W.2d at 765 n.1 (quoting McDonald, 335 U.S. at 456).

Gutierrez v. State, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007).

Crane v. State, 786 S.W.2d 338, 346 (Tex. Crim. App. 1990)

**STATUTES and RULES**

Texas Penal Code 49.04

Rule 44.2(a) of the Texas Rules of Appellate Procedure

See TEX. R. APP. P. 44.2(a)

Hernandez v. State, 60 S.W.3d 106 (Tex. Crim. App. 2001)

Snowden v. State, 353 S.W.3d 815, 821 (Tex. Crim. App. 2011).

**End Notes:**

I Adams, R., & Victor, M. (1993). Principles of Neurology, 5th edition. McGraw-Hill, Inc.: New York

2      Burns, M.,& Anderson, H.( 1995). A Colorado validation study of the standardized field sobriety (SFST) battery. Final Report. Colorado Department of Transportation.

3      Burns, At, & Dioquino, T.( 1997). A Florida validation study of standardized  field sobriety test (S.F.S.T. battery. Florida Department of  Transportation.

4      De Myer, W. Neuroanatomy.  Williams & Wilkins, Baltimore.

S  DWI detection and standardized field sobriety testing Student manual .( 1995). NHTSA, U.S. Department of Transportation.

6      DWI detection and standardized field sobriety testing Instructor manual. ( 1995). NHTSA, U.S. Department of Transportation.

7      Elliot. C., & Murray. A. (1998). Repeatability of body sway measurements; day-to-day variation measured by)sway magnetometry . Physiol. Meas.19, 159- 164.

8      Lee, D..& Lishman, J. ( 1975). Vision -the most efficient source of proprioceptive information for balance control. Symposium international de posturegraphie, 83-93.

9      Mills, K., & Bisgrove, E. (1983). Body sway and divided attention performance under the influence of alcohol: Dose-response differences between males and females. Alcohol Clincial and Experimental  Research, 7(4), 393-397.

10 Nardone, A., Tarantola, J., Giordano, A., & Schieppati, M. (1997). Fatigue effects on body balance. Electroencephalography and clinical Neurophysiology, 105, 309-320.

11.Netter, F. (1993). Compilation of Pathological and Anatomical Printing. CIBA Pharmaceutical Publications, Netter F. The CIBA Collection of Medical Illustrations , Volume 1. CIBA Pharmaceutical Publications.

12 Newell, F. (1996) ophthalmology: Principles and concepts, 8th edition. Mosby-Year book Inc.

13.Psychophysical tests for DWI arrest. 91977). U.S. Department of Transportation.

14 Stuster, J.,& Burns, M. (1998). Validation of the standardized  field sobriety ) test battery at BACs below 0.10 percent. Final Report, NHTSA. U.S. Department of Transportation.

15. Tharp, V., Burns, M., & Moskowitz., H. (1981). Development and field test of psychophysical tests for DWI arrest. Final report, NHTSA, U.S. Department of Transportation.

a.  Albinism with an absence of pigment cells causes a loss of cells for focusing on objects.
b.  Retinatitis Pigmentosa where the cells of the Macula, the central part of the eye, degenerate, which makes visual acuity disappear.
c.  Diabetes, where small hemorrhages may kill off parts of the cells that helps sees on the retina.
d.  Multiple Sclerosis, and Rheumatoid Arthritis both a demyelinating disease that can affect nerves, makes them respond erratically , and causes blind spots on the retina.

## STATEMENT OF THE CASE

This is an appeal of the judgment and sentence in a criminal case for the County Court at Law Number 1 in Hunt County, Texas. Appellant Plead Guilty to the crime of Driving while Intoxicated Second. (RR Vol. 3 p.8) Appellant filed in the trial court an election to punishment to be made by the trial court on August 12th, 2013. The court ordered a pre-sentence investigation. Appellant was assessed a sentence of imprisonment for Two Hundred Fifty (250) days in the Hunt County Jail, $0.00 fine, and $433.00 in court costs on October 14th, 2013 by the trial court. Motion for New Trial was timely filed on November 4th, 2013 in the trial court and has yet to be heard. The court reporter's record was filed on April 26th, 2013. Appeal was affirmed on November 10th, 2014. Motion for rehearing was filed on November 12th, 2014. Motion was granted on November 25th, 2014.

# ISSUES PRESENTED

**Point of Error One:**

Defendant's Fourth Amendment rights were violated when the officers failed to obtain a search warrant.

**Point of Error Two:**

Trial court erred in the admissibility, utilization and refutation of the State's evidence concerning field-sobriety test.

**Point of error Three:**

Trial court erred in allowing Trooper Goodwin to testify that there is a certain level of intoxication that can be determined by the HGN .

## Statement of the facts

Appellant pled guilty to Driving While Intoxicated, Second . (RR Vol. 3 p.8). The trial court admonished Appellant of the charge and the range of punishment. (RR Vol. 3 p.8-15). The trial court then admonished the Appellant that the State was seeking to enhance his punishment range from a Class B misdemeanor to a Class A misdemeanor. (RR Vol. 3 p. 8-15). The court informed Appellant that she had the right to have a presentence investigation and ordered it done. (CR Vol. 1 p. 195). During the sentencing hearing the State moved to admit Exhibits 1-6 which included the roadside videos, intoxilizer videos and her test results and records obtained from criminal records from Dallas County. Without objection from the Defense the trial court admitted them. (RR Vol. 3 p. 25). Both sides presented arguments and the Court came back with a sentence of two hundred and fifty days in jail. (RR Vol. 5p. 113-125).

## SUMMARY OF THE ARGUMENT

Jessica Nicole Nance appeals from her conviction, on an open plea of guilty, of driving while Intoxicated (DWI) second offense. Following a hearing on punishment, the trial court sentenced Nance to 250 **days** in jail. Nance's appointed appellant counsel filed an Anders brief in the matter detailing the procedural history of the case, summarizing and analyzing the trial evidence, and stating that he found no meritorious issues to raise on appeal. Nance availed herself of the opportunity to file a pro se response. Nance contends that she received ineffective assistance of counsel with respect to each of the following issues: (1) **Defendant's Fourth Amendment rights were violated when the officers failed to obtain a search warrant. (2) Trial court erred in the admissibility, utilization and refutation of the State's evidence concerning field-sobriety test. (3) Trial court erred in allowing Trooper Goodwin to testify that there is a certain level of intoxication that can be determined by the HGN .**

## Point of Error One:

### Defendant's Fourth Amendment rights were violated when the officers failed to obtain a search warrant.

#### Requirement of a Search Warrant

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue" unless certain requirements are met. U.S. CONST. AMEND. IV; see also TEX. CONST. art. I, § 9. This right "proscribes all unreasonable searches and seizures," Gonzales v. State, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012), and its "basic purpose . . . is to safeguard the privacy and security of individuals against arbitrary invasion by government officials," Haynes v. State, 475 S.W.2d 739, 741 (Tex. Crim. App. 1971).

"Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme Court of the United States] has inferred that a warrant must generally be secured." Kentucky v. King, 131 S.Ct. 1849, 1856 (2011). Thus, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); Gonzales, 369 S.W.3d at 854. "'Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.'" Bray v. State, 597 S.W.2d 763, 765 n.1 (Tex. Crim. App. [Panel Op.] 1980) (quoting McDonald v. United States, 335 U.S. 451, 455 (1948)). The warrant requirement has been described as one of "the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." Johnson v. United States, 333 U.S. 10, 17 (1948).

Judicial issuance of a warrant is important because it "provides . . . a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime." Hudson v. State, 588 S.W.2d 348, 351 (Tex. Crim. App. 1979) (quoting United States v. Chadwick, 433 U.S. 1, 9 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 568–80 (1991) (internal quotation marks omitted)). A neutral magistrate's prior review "prevent[s] hindsight from coloring the evaluation of the reasonableness

of a search or seizure." United States v. Martinez–Fuerte, 428 U.S. 543, 565 (1976); see also Beck v. Ohio, 379 U.S. 89, 96 (1964) ("An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment."); Clay v. State, 391 S.W.3d 94, 100 n.21 (Tex. Crim. App. 2013) ("'[O]ne important function of the warrant requirement is to facilitate review of probable cause and avoid justification for a search . . . by facts or evidence turned up in the course of [its] execution.'" (quoting Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.3(b), at 511 (4th ed. 2004))).

"The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn . . . ." Jones v. United States, 357 U.S. 493, 499 (1958). Those exceptions include "voluntary consent to search, search under exigent circumstances, and search incident to arrest." McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). It is the State's burden to show that a warrantless search falls within one of these exceptions. Id.

In the case of the Defendant Nance a search warrant was never obtained . Although Deputy Fernandez arrived at the scene at 2:57 a.m and the Defendant wasn't until arrested until 4:30 am at no time was a search warrant ever requested even though the Defendant's vehicle was searched and two bottles of empty wine were found (RR. Vol. 4) the car had not been impounded at the time of the search nor had a wrecker been called to pick up the vehicle at the time of the search. In fact the car was searched more than once by more than one officer. Although one of the officers testified that he was checking for "inventory" it was impossible to check for inventory when the Defendant hadn't even been placed under arrest for any crime nor had she been asked to perform any FST at the time of the search. The officer (Trooper Goodwin) testified to having searched the car only for "inventory " purposes however he had not come in contact with the suspect at the time of the search and seizure to know if the car would indeed have to be impounded.

## Burden To Prove an Exception to the Warrant Requirement

"A defendant who alleges a Fourth Amendment violation has the burden of producing evidence that rebuts the presumption of proper police conduct. He may carry this burden by establishing that the seizure occurred without a warrant." State v. Robinson, 334 S.W.3d 776, 778–79 (Tex. Crim. App. 2011) (footnotes omitted); see Robinson, 334 S.W.3d at 780 (Cochran, J., concurring); Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). The burden then shifts to the State to prove that the seizure was nonetheless reasonable. Robinson, 334 S.W.3d at 779; Amador v. State, 221 S.W.3d 666, 672–73 (Tex. Crim. App. 2007). In this case a warrant was needed to search the car because the Defendant did not give consent for the car to be searched.

## Exigent Circumstances

"'We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.'" Bray, 597 S.W.2d at 765 n.1 (quoting McDonald, 335 U.S. at 456). Exigent circumstances typically fall within one or more of three categories: (1) "providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance"; (2) "protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous"; and (3) "preventing the destruction of evidence or contraband." Gutierrez v. State, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007).

Nowhere in the record does it state the officers believed the Defendant was armed and dangerous, needed medical attention, or they felt that she was going to destroy evidence. The State failed to establish exigent circumstances. The State has the burden to show "exigent circumstances...made obtaining a warrant impracticable"); Crane v. State, 786 S.W. 2d 338, 346 (Tex. Crim. App. 1990) ("In order for a warrantless arrest or search to be justified, the State must show ...the existence of circumstances which made the procuring of a warrant impracticable.")

In Douds, the Fourteenth Court of Appeals found that the record did not reflect exigent circumstances because it contained no mention of a warrant and because there was no evidence regarding what the officer knew regarding the time needed to obtain a warrant. Douds, 434 S.W.3d at 855. A finding of exigent circumstances "must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction of removal of evidence...." (emphasis added))). No attempt was made to obtain a warrant in this case. Even though there were about half a dozen officers on the scene in this case and this accident happened almost a hour and 15 minutes later there is no indication that officers not on the scene were unavailable to help obtain a warrant.

## Harm Analysis

Because the State failed to meet its burden, a harm analysis must be performed. The admission of evidence obtained in violation of the Fourth Amendment is subject to constitutional harm analysis pursuant to Rule 44.2(a) of the Texas Rules of Appellate Procedure. See TEX. R. APP. P. 44.2(a); Hernandez v. State, 60 S.W.3d 106 (Tex. Crim. App. 2001). "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, [we] must reverse [the] judgment of conviction or punishment unless it is determined beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). The harmless error inquiry under Rule 44.2(a) should adhere strictly to the question of whether the error committed in a particular case contributed to the verdict obtained in that case. Snowden v. State, 353 S.W.3d 815, 821 (Tex. Crim. App. 2011).

The accident occurred at 2:57 a.m. the Defendant Nance wasn't taken into police custody until 4:30a.m. which gave the officers at the scene more than enough time to request a search warrant.

\

## Point of Error Two:

### Trial court erred in the admissibility, utilization and refutation of the State's evidence concerning all of the field-sobriety test that were administered

Texas Trooper Bubba Goodwin was sworn on August 13th, 2013. (RR. Vol 4 pg.6). At approximately 2:57 am on July 25th 2011 Trooper Bubba Goodwin was called to assist in a accident. Based on Trooper Goodwin's testimony nance was believed to be in intoxicated because he could smell alcohol on her, she thinks she is headed "home" but she is actually 50 miles away, and the results from the HGN task, the one leg stand, the finger dexterity and the alphabet test. (RR Vol. 4 p. 16-17) During examination Trooper Goodwin testified that there is a certain level of intoxication that can be determined by the horizontal gaze nystagmus.( RR. Vol 4 pg. 10 lines 24-25) Trial counsel objected to his testimony stating that he isn't allowed to interpret the results. (RR. Vol. 4 pg. 12 lines 11-19). The trial court overruled the objection (RR.Vol. 4 pg. 12 line 20-24). Trooper Goodwin testified he didn't perform the walk and turn test because the Defendant informed him she had "bad knees". (RR. Vol. 4 pg. 13 1-4). Although Defendant informed Trooper Goodwin of her bad knees and Rheumatoid Arthritis she was still asked to perform the one leg stand test which is a test that requires a individual to put all of their body weight onto one knee. (RR Vol. 4 pg. 14 lines 5-7) Trooper Goodwin testified to performing two non-standardized tests. The alphabet and the finger dexterity. He said that Nance performed poorly on both. RR. Vol. 4 pgs. 14-16) Trooper Goodwin admitted to giving the Defendant instructions to the one leg stand that suggest that it was "ok for the Defendant to put her foot down and pick it back up." What he failed to do was to inform the Defendant that it indeed was NOT ok to put her foot down because putting her foot down was one of the

clues that he was looking for to see if she was indeed intoxicated. (RR Vol. 4 pg 21 lines 21-25 ; page 22 lines 1-9 and RR Vol. 4 pg 21. Lines 20-25)Trooper Goodwin also testified that the Defendant informed him BEFORE taking the tests that she had Rhuematoid Arthritis (RR Vol 4 pg 23 lines 1-4) He testified that he failed to inquiry as to what parts of her body she suffered the Arthritis from. (RR Vol. 4 pg. 23 lines 6-25)) and he also testified that her ability to stand on one leg or knee or count on her fingers could all be affected by Arthritis . (RR Vol. 4 pg. 24). Trooper Goodwin testified that even though the finger dexterity and the alphabet tests weren't standardized tests they were  still an indicator of intoxication because she performed poorly.( RR. Vol. 4 pg. 16 lines 4-9)Defendant was then placed under arrest. (RR. Vol. 4 pg. 16 lines 11-13).

While a State's witness can testify as to what was observed while conducting field sobriety tests and can testify that such tests helped inform the witness decision to arrest a defendant even assuming the Court allows the State to adduce testimony regarding the administration of the HGN test and the one leg stand in Nance's case Trooper Goodwin shouldn't have been allowed to testify that such tests for example correctly identify intoxicated individuals. See. Tex.R. Evid. 705 (b). In the Defendants case the arresting officer Trooper Goodwin testified that the Defendant was over the limit of 0.8. (RR. Vol . 4 page 19).

In Emerson v. State, 880 S.W. 3d 759, 768-69 (Tex. Crim. App. 1994), the Court ruled that an officer's testimony showing a correlation between a person's performance on the horizontal gaze nystagmus test and a specific blood alcohol concentration was impermissible. A later court applied the Emerson court's analysis to the one leg stand test and it came to the same conclusion as the court in Emerson. McCrae v. State, 152 S.W. 3d 739, 746 9Tex. App. 2004). Use of impermissible testimony is a constitutional error because it violates a defendant's due process and fair trial rights under the Sixth Amendment as incorporated against the States through the Fourteenth Amendment.  The appropriate test then is whether the appellant was harmed by the court's error, even though there was an objection and in this case the Defendant was harmed which in this case was ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim the appellant must show by a preponderance of the evidence both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984); Williams v. State, 301 S.W. 3d 675, 687 (Tex. Crim. App. 2009). Appellant must demonstrate under the first prong that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88; Ex parte Lane, 303 S.W. 3d 702, 707 (Tex. Crim. App. 2009). There is a strong presumption that counsel acted professionally and that counsel had his or her strategic reasons behind decisions that may appear to be errors. Strickland at 689.

To meet the second prong, appellant has to show the existence of a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. Strickland, 466 U.S. at 694; Ex parte Lane, 303 S.W. 3d at 707. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Jackson v. State, 877 S.W. 2d 768, 771 (Tex. Crim. App. 1994); Simms v. State, 848 S.W. 2d 754, 756 (Tex. App.—Houston {1st Dist.} 1993, pet. ref'd).

In 1975, NTHSA funded a research project run by the Southern California Research Institute. At that time, Dr. Marceline Burns was a founder and researcher at that organization. The project was to determine if there were, either individually or in combination, any roadside tests that could aid an officer in determining whether a person was under the influence of alcohol. (See Statement Under Oath of Dr. Burns attached hereto).

Pursuant to that contract, research was performed evaluating many of the commonly used roadside tests and narrowing the list to approximately 15 tests that were used Nationwide and seems to have some usefulness. From that group of 15 tests only 6 were eventually believed to be valid and feasible at roadside. (Burns Stmt at 10-15)

These six tests were then studied in controlled laboratory experiments to determine their accuracy. (Burns Stmt at 22-24). In the end, a combination of

three tests were determined to be the best indication of impairment. There three tests: horizontal gaze, nystagmus, one legged stand, and walk the line, were adopted by NTHSA as the ONLY tests to determine sobriety at roadside. (Burns Stmt at 7-8).

Additionally, as Dr. Burns has pointed out on many occasions, variance from the proscribed manner of administering, observing, and evaluating an individual's performance of the three standardized tests deprives the tests of reliability and accuracy. "Therefore the scoring and the observations don't relate to any of the research data or any of the accumulated data over the years. " (Burns Stmt at page 30, line 4-7).

This position, that only tests given in the "standardized" manner, have any validity is echoed in virtually every police manual regarding field sobriety tests.

The Ohio Supreme Court in State v. Homan (April 26, 2000) 89 Ohio St. 3d 421, 732 N.E. 2d 952, held that any variation in the use of the NHTSA Standardized Field Sobriety Tests makes the results completely unreliable as relates to probable cause, a lower standard than required for conviction. The court found "it is well established that in field sobriety testing even minor deviations from the Standardized procedures can severely bias the results." This is dues in part, the court reasoned, to "the small margins of error that characterize field sobriety tests making strict compliance critical" and "when field sobriety testing is conducted in a manner that departs from established methods and procedures, the results are inherently unreliable."

Based on the foregoing rationale, the Ohio Supreme Court ruled " in order for the results of a field sobriety test to serve as evidence of probable cause to arrest, the police must have administered the test in strict compliance with standardized testing procedures. " In the case of the Defendant here, Trooper Goodwin did not use the three standardized tests. The test the officer did used (alphabet and finger dexterity) have not been the subject of any review or study. Any tests that the officer did use from the three battery approved by NHTSA were done inconsistently with the prescribed matter. As stated above, such variance from the standard effectively creates a new test. Based on the foregoing, those

test do not meet the Kelly test for admissibility. Furthermore, it is clear that the standard enunciated for admissibility in Kelly cannot be met by the prosecution.

The standard for admissibility of evidence based on new scientific techniques first propounded in Kelly and left unchanged by Daubert is applicable to field sobriety tests. Pursuant to the Texas Evidence Code and the decisions of the United States Supreme Court in Kumbo Tire, the Kelly standard is applicable to testimony based on training and experience as well as more traditional "scientific" knowledge. Under that standard, field sobriety tests are inadmissible evidence until shown to be in conformance with Kelly which in this case the prosecution has failed to do. The tests used in this case do not and cannot be shown to meet this standard of reliability and should be precluded.

Based on the analysis of virtually every state court decision, and hearing or reading from the foremost experts in the field of DUI/DWI investigation for both prosecution and defense, the United States District Court for the district of Maryland " the results of the SFSTs either individually or collectively, are not admissible for the purpose of proving specific blood alcohol content (BAC) of a driver charged with DWI/DUI." U.S. v Horn (D. Md. 2002) 185 F. Supp. 530. Therefore, evidence of performance on the SFSTs is not relevant .

Dr. Marceline Burns, considered by most courts to be the foremost proponent of SFSTs (see e.g., Horn, supra), has stated under oath "What you're asking is are these tests of driving? They are not...The officer is not charged with making a decision about driving skills at roadside. He couldn't. There's no way you can judge somebody in five minutes at roadside that you never saw before to make a decision about their driving skills." (Statement of Dr. Marcelline Burns Under Oath, April 17th, 1998).

Since these tests, according to their foremost proponent, cannot indicate driving ability, let alone impairment, they are not relevant to the charge of Driving While Intoxicated Second.

Based on the foregoing, any testimony with regards to SFTS's is irrelevant and should be precluded.

In the closing of Trooper Goodwin's testimony he was asked by the Court to clarify one of the reasons why Defendant was arrested for DWI.

Court: I want to clarify something in my own mind relating to your testimony about the reasons for the DWI arrest. One of them you said was that she well, let me just ask you the question. I think that I heard her say, when you said, where are you heading, I think that you---she replied home; is that correct?

A. That's correct.

Q. All right. And then when you asked where she lived she said Dallas?

A. Dallas.

Q. If the accident occurred in Royse City but she was stopped in Hunt County, it's true to say that she was driving east bound on I-30, which is away from Dallas is that correct?

A. That is correct.

Q. Okay. And that's one of the reasons you used in your decision to arrest her?

A. That's correct.

FURTHER CROSS EXAMINIATION:

BY Mr. Brooks:

Q. Based on that, Trooper Goodwin are you familiar with Mount Pleasant, Texas?

A. Yes sir.

Q. In what direction from the accident---or excuse me your stop would Mount Pleasant be in?

A. East

Q. On past Greenville?

A. That's correct.

Q. Did you ever inquire of Ms. Nance where she was actually from?

A. No, sir.

Q. Okay. So if she's from Mount Pleasant, that would be the direction of going home, would it not?

A. I asked her where she was going. She said home, and her home was in Dallas.

Q. Actually, what you asked her, was where do you live.

A. Where do you live.

Q. And she said Dallas.

A. Okay.

Q. Sometimes folks refer to a different place as home as opposed to where they live, don't they?

A. Yes, sir.

(RR. Vol. 4 pgs. 29-31.)

In John V. State, 517 S.W. 2d 536 (Tex. Crim. App. 1975) which has long stood for the proposition that being intoxicated at the scene of a traffic accident which the defendant was alleged to be the driver was not evidence that the defendant was driving while intoxicated.

Texas law requires the State to establish, beyond a reasonable doubt, a temporal link between Defendant's intoxication and her driving. Here, the admitted evidence did not establish Defendant had a blood alcohol content of 0.08 or above at the time she was behind the wheel and the circumstantial evidence did not establish Defendant lacked the normal use of mental or physical faculties. As a result, no rational fact-finder could have found the

essential elements of driving while intoxicated beyond a reasonable doubt. Defendants conviction should therefore be reversed.

**According to the unpublished opinion in Gilliand v. State:**

In evaluating legal sufficiency of the evidence supporting (a) DWI conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of DWI beyond a reasonable doubt. Brooks v. State, 323 S.W. 3d 893, 912 (Tex. Crim. App. 2010) (citing Jackson v. Virginia, 443 U.S. 307, 319 91979); Hartsfield v. State, 305 S.W. 3d 859, 863 (Tex. App.-Texarkana 2010, pet. ref'd) (citing Clayton v. State, 235 S.W. 3d 772, 778 (Tex. Crim. App. 2007). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. Brooks, 323 S.W. 3d at 917 (Cochran, J., concurring). We examine legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the trial judge "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable interferences from basic facts to ultimate facts." Hooper v. State, 214 S.W. 3d 9, 13 (Tex.Crim. App. 2007) (citing Jackson, 443 U.S. at 318-19).

NOT REPORTED in S.W. 3d, 2011 WL3862861, (Tex. App.-Texarkana 2011, no pet.).

## Point of Error Three

Field sobriety tests were standardized in 1977 by the National Highway Traffic Safety Administration (NHTSA) and since then have been taught to law enforcement officers on a national basis to determine who is "Driving While Intoxicated." The primary NHTSA research was done with 238 allegedly normal volunteers, with three Standard Field Sobriety Tests. The studies suggested that the combined results of 3 failed tests (SFSTs) the Horizontal Gaze Nystagmus (HGN),the One-Legged Stand, and the Walk and Turn correlated 80% of the time with the subjects' Blood Alcohol Concentration (BAC) of 0.1 mg % or higher. In 1995, these tests were correlated to a BAC of 0.087 mg % [2] and in 1997 to a BAC of 0.05% [3], and the results were shown to be almost the same. Interestingly, the research never provided a direct correlation with an individual's failure on the 3 SFSTs and a loss of normal use of either mental or physical faculties.

They have provided what law enforcement was seeking when NHTSA tried not to develop a more sensitive test that would provide more reliable evidence of intoxication [13]." The National Highway Traffic Safety Administration have viewed the SFSTs as a quick, simple, non-evasive way to determine Blood Alcohol Concentration (BAC} at a level that they defined as "intoxication" for everyone. This brief will review one of these tests, the Horizontal Gaze Nystagmus (HGN) Test, and will demonstrate problems in using it as a determinant of whether someone is accurately and reliably evaluated as Driving While Intoxicated.

Blood Alcohol Concentration (BAC) in fact is not a measure of intoxication, but only of the level of alcohol in the blood at that moment in time. Despite NHTSNs desires and research pronouncements, there are problems with these SFSTs. Its initial support for these studies, however, was guarded because the 1977 initial report included the following disclaimer on the front page. "Prepared for the Department of Transportation, National Highway Traffic Safety Administration ,under Contract No. DOT: HS-5-01242. This document is disseminated under the

sponsorship of the Department of Transportation in the interest of information exchange. The United States Government assumes no liability for the contents or use thereof. (11): It is of important note that other NHTSA funded studies by the same primary researcher, Ms. Marcelline Burns (a behavioral psychologist), in collaboration with colleagues at the Southern California Research Institute (ANACAPA Science, Inc.), a center she directs, included the same disclaimer.( 3,5,6,13,14)

Overview

The only true way to directly measure Blood Alcohol Concentration (BAC) is to draw blood and to measure the alcohol level in a proper laboratory. Field Sobriety Tests are indirect, and at best, circumstantial, measures of the BAC.

The validity of indirect measures of BAC becomes even more suspicious with the realization that it is dependent on the external environment and the individual's current physical and emotional state. An individual's ability to perform these tests involves the functioning of their total body, including their nervous, skeletal and muscular systems. This cannot be assessed without knowledge of the individual's past medical history, including physical traumas, and are probably too complex to be done by non-medically trained personnel such as law enforcement officers.

The original studies documented that between 68% and 80% of the people who failed 1to 3 Field Sobriety Tests had a BAC of at least 0.1 mg % (as tested by breath (13), another indirect measure). By adding in those individuals who were not judged intoxicated (ones for whom BAC was below 0.1 mg%) , the SFST was depicted to be 90% accurate for all people tested. Interestingly, this 90% figure also included over 20% who tested positive and failed the Field Sobriety Tests, and were therefore assumed to have a 0.1 mg% BAC but in fact had a BAC lower than that level. Accordingly, using the SFST in the real world of DWI arrests, these

individuals would have been wrongly declared intoxicated and in turn would have lost their license, been arrested and possibly convicted. It must be emphasized here that the study's statistics show that the  percentage of individuals who test positive but have a BAC lower 0.1mg% got as high as 35% if just one of the SFTs was used.

The Southern California Research Institute's 90% accuracy claim for everyone is an ostensively impressive sounding percentage. This claim, however, becomes invalid when one realizes that the BAC was determined by breath testers, another in- direct measure with questionable accuracy .This 90% accuracy number becomes further suspect when the BAC was dropped to 0.08 mg % (State of Florida Test) and again to 0.05 mg % (Colorado Test,}(3),because logically and realistically, there would be some change in accuracy, or a higher percentage of people who would test positive as the BAC level is lowered, but the percentage stayed the same.

In most states, when an individual fails the SFSTs and then refuses a breath test, they are assumed by the government to have a BAC greater than the acceptable level of 0.08 mg%. This means that 20% (1/5) to 35% (1/3) of all people who failed the SFSTs and then refused a breath test would lose their license, although their true BAC would have been lower than the legal limit of 0.08 mg % if it was done by a direct test, such as blood. There is increasing political and financial pressure by the National Highway Traffic Safety Administration (NHTSA) for the states to drop the level at which legal intoxication is determined to 0.08 mg % and to continue to use the SFSTs to measure this level. The Southern California Research Institute (ANACAPA Science, Inc.) has done studies of the SFSTs at the 0.08 mg% level in Florida in 1995 and subsequently at the 0.05 mg% level in Colorado in 1997 (2) Their findings, which again combined individuals both above and below the sought after BAC level of 0.08 mg% and 0.05 mg%, promoted  over 90% accurate information. These percentages again are misleading because they grouped individuals both above and below the sought after BAC level in providing the results. They are suspect because in a normal statistical distribution of subjects, the percentage of people who test positive should increase significantly as the level of BAC is lowered from 0.1 mg% to 0.08 mg%, and then to 0.05 mg %,

but in fact it remains almost the same. Even the Horizontal Gaze Nystagmus Test which is touted by NHTSA as the most accurate test of all three SFSTs and is not subjected to voluntary control, reflects little change in the percentage of individuals testing positive as the BAC levels drops from 0.1 mg% to 0.08 mg% to 0.05 mg %.

The Horizontal Gaze Nystagmus Test has been viewed as the premier Standardized Field Sobriety Test by the Southern California Research Institute because it has a claimed higher accuracy rate than the other two tests and appears to be totally out of the individual's conscious control.

To understand what HGN is, it is necessary to review how the test is done and what neuroanatomically and physiologically is involved in a positive test result. Understanding this will help explain why there are many other factors besides alcohol and drugs that can precipitate or exaggerate HGN.

Adams' "Textbook of Neurology" defines nystagmus as the "involuntary rhythmic movements of the eyes". The NHTSA Driving While Intoxicated Detection and Standardized Field Sobriety Test Instructor and Student Manuals define Nystagmus for law enforcement as "the involuntary jerking of the eyes, occurring as the eyes gaze toward the sides.(5,6)." These Manuals go on to say" nystagmus is a natural, normal phenomenon, they merely exaggerate or magnify it." Interestingly, the Southern California Research Institute first called this "Alcoholic Gaze Nystagmus, most likely because there are so many other causes for it besides just alcohol.

In a physiological sense, HGN occurs when the eye follows an object. The slow, natural tracking of the object (smooth pursuit) stops, the eye quickly darts back toward the midline, then returns to slowly track the object a little further to the side, then quickly darts back to the midline, and this process continually repeats itself. This is a normal phenomenon, which should occur in all people as the NHTSA Driving While Intoxicated manuals point out. There are two phases in this process. A slow, tracking phase, or "smooth pursuit", in which the eye follows the object away from the center, and a fast,

compensatory phase, when the eye flicks back toward the midline, the position it had originally started from. The neuroanatomy of this process is very complex and involves the Labyrinth System of the Inner Ear, the Optic Nerve, the Extra-Ocular Muscles of the eye, the Cerebellum of the brain, the Pons of the Brain Stem, as well as the neutral pathways that connect these structures.

The Retina of the eye must see the object without distortion, and have that message register in the optic region of the brain. Of the Extra-Oculomotor Muscles, the Lateral and Medial Rectus of each eye must be the only muscles involved in just lateral movement, tracking, and actual Horizontal Gaze Nystagmus. If other muscles of the eye are used or stimulated, then there is no checking of horizontal gaze. As the eye moves to follow the object, the nerves and muscles send information via neural pathways to the Cerebellum about the amount of movement, with the Cerebellum then sending back information to the eye muscles about how much more or less to move, and this feedback process continues again and again.

The Labyrinth System of the Inner Ear simultaneously transmits information to the Cerebellum and the Pons about the body's position, trying to correlate that with the information it is receiving from the Oculomotor muscles about the amount of eye movement, and this process continues again and again. This is very fast and very complicated, and it involves multiple feedback loops and transitions (1,11,12) . Anything that affects these neuroanatomical structures or neural pathways will influence how Nystagmus will be manifested.

The NHTSA HGN Test Itself

The NHTSA Horizontal Gaze Nystagmus Test must be done without glasses or contact lenses, and eye problems can invalidate the results. A light or pointer is held 12 inches away from the (face, at the mid point of the eye and slowly moved toward one side and then the other. The individual receives a total of up to six points based on poor performance in three different aspects of the test, although

only four are required to fail the test, which would determine that their BAC was over 0.1mg %,0.08 mg %, or 0.05 mg %, depending on the study:

I The eye tracks laterally toward the side, and if the slow tracking is not smooth, the individual receives one point for each eye that the tracking is not smooth.

2    The object is then held to the far lateral side of each eye, and if there is jerky movement in that corner ,the individual is again scored one point for each eye that there is significant movement.

3    Finally, the angle from directly in front that nystagmus begins is determined, and if it occurs before a 45° angle, they again receive one point for each eye that it occurs in.

Scientific Basis for the

Blood Alcohol Level Influence on HGN

Several valid scientific research findings have provided the basis for understanding that alcohol can influence Horizontal Gaze Nystagmus (HGN). These include the Effects of Alcohol on the Inner Ear and the Effects of Alcohol on Muscles.

1.    Alcohol Effect on the Inner Ear

Real science has shown that the alcohol level in the blood will be different than the alcohol level in the Labyrinth System of the Inner .Ear during the Ascending and Descending phase of alcohol use because alcohol is slow to pass through to the blood brain barrier .This means that during the Ascending

Phase of alcohol use, when alcohol is being ingested, the blood will have a higher level of alcohol than the Inner Ear's Labyrinth System has. Then, during the Descending Period of alcohol use, when alcohol is being metabolized more rapidly than it is being ingested, the alcohol level in the Inner Ear's Labyrinth System will be higher than that in the blood. This disparity between the alcohol level in the blood (BAC) and that in the Inner Ear causes the eyes to move in a non-smooth, less rhythmic manner, undershoot and then overshoot the target they are following which gives a "jerky • non-smooth appearance called Hori1.ontal Gaze Nystagmus. To the non-medical observer, the eyes have trouble following, or have problems compensating, and appear to act like "a marble rolled on sandpaper" as the NHTSA Student Manual states,(5,6).

## 2. Alcohol's Effect on Muscles

Alcohol is a Central Nervous System Depressant, and as such can have a slowing effect on nerve transmission and muscle movements. The effect of alcohol is thought to slow the "smooth pursuit" or tracking movement of the eye, which will exacerbate normal nystagmus and make it look jerky. This depressant effect is though to increase as one's alcohol level increases, and it is another scientific finding which helps to understand why Horizontal Gaze occurs.

These two scientific facts explain why alcohol in the blood can cause an exaggeration in normal nystagmus, which is the basis for the HGN of the SFSTs. These legitimate scientific findings were then extended by assumptions that the Southern California Research Institute made to validate their own test results. Real science and research, however, has also proven that many other factors can cause or exaggerate Horizontal Gaze Nystagmus in a non-intoxicated individual.. In fact, these other causes of HGN are very important because they speak to the validity of the law enforcement determination of Intoxication , and subsequent revocation of a Driver's License and/or a DWI conviction. They may also be too complex, involving so many neuroanatomical structures and be so influenced by past and present medical issues, that non-medical personnel, such as law enforcement officers, simply cannot accurately perform it .

## Other Causes of HGN

### Medication

Alcohol, its effects, and how to score an individual's performance on the HGN test is the primary focus of the NHTSA DWI Law Enforcement Training Manuals. These manuals also acknowledged that Barbiturates and PCP could cause Nystagmus (4,5) Many prescription medications can also cause or exacerbate Nystagmus, but are not usually queried about by the examining officer, including pheny-toin (seizure medication). lithium (mood stabilizer), antihis- tamines (allergy medication). and barbiturates (seizure medication). Of critical import here is to understand that although these drugs exaggerate, enhance and cause Nystagmus, they also help the "abnormal" person to function normally. If the individual were stopped and tested by a law enforcement officer for HGN, as in the case of the Defendant they would test positive, although they are in fact on medication to help them function normally.

### Retina, Optic Nerve Damage

The Retina and Optic nerve may be damaged sufficiently to cause or to impair the HGN test but not be damaged enough to impair an individual's ability to see to drive. Diseases can impair the Macula. This is the central part of the retina, which is the part of the eye that has the most sensitive Optic Nerve cells and which helps an individual to accurately focus on an object. Any disease such as Albinism, Arthritis ,Retinatitis Pigmentosah, Diabetes, and Multiple Sclerosis" can affect this part of one or both Retina and in turn cause or exacerbate HGN. People who are born with eye problems such as Strabismus (cross-eyed) or who have had eye or lid surgery may normally have Nystagmus, which would be unrelated to alcohol use(12). Exaggerated Nystagmus may also manifest in individuals such as miners who have worked in the dark for long periods of time.

### The Extra-Ocular Muscles

There are six Extra-Ocular muscles for each eye that move the eyeball itself. These are the Medial Rectus and the Lateral Rectus muscles, the ones used in Horizontal Gaze Nystagmus , as well as the Superior Oblique, the Superior Rectus, the Inferior Oblique and the Inferior Roctus muscles. The NHTSA HGN test is supposed to be designed only to test the function of just two cranial nerves (III and IV) as well as just the two solitary, opposing Occulomotor muscles they innervate, the Lateral and Medial Rectus muscles of each eye(4,11). Those two Occulomotor muscles of each eye are "yoke" muscles in that they work together while opposing each other .In this manner, one contracts while the other relaxes, enabling the eye to move from side to side. In turn, the two eyes must also work together in order for them to focus on and to follow an object for the test. The disparity between each eye's performances is viewed as an indication of intoxication in the DWI Instructor and Student Manual. In fact, any problem with these nerves or muscles can cause an exaggeration in Nystagmus, or a disparity between one eye's movement and the other .The cause of this could be surgery in childhood to correct eye problems, damage to the muscles of one eye, or even a "lazy eye, "which will cause Nystagmus, although the individual had not been drinking.

Alcohol, which depresses the Central Nervous System, may affect the smooth coordination of these two opposing muscles and cause a breakdown of the balance between them, which many exacerbate nystagmus. The NHTSA HGN examination is done above eye level, which is what the NHTSA Manuals and Videos recommend. This height brings into play the four other Occulomotor muscles (the Superior Rectus, the Superior  Oblique, the Inferior Rectus and the Inferior Olique muscles) and other cranial nerves (the Trochlear and branches of the Occulomotor).

Position the stimulus approximately 12-15 inches from the suspect's nose and slightly above the eye level. Check the suspect's eyes for the ability to track together. Move the stimulus smoothly across the suspect's entire field of vision. Check to see if the eyes track the stimulus together or one lags behind the other, if the eyes don't track together it could indicate a possible medical disorder, injury, or blindness.

Testing in this manner complicates and invalidates the HGN test because not just the Lateral Rectus and Medical Rectus Occulomotor muscles are being tested. The test as it is taught and as the NHTSA Manual instructs is then invalid.

Inner Ear

An intact Inner Ear Labyrinth System is essential for differentiating between normal and abnormal Nystagmus. Deafness, tinnitus (ringing in the ear). Meniere's disease and injuries to one or both ears from trauma or infection will affect the inner ear and may damage the Labyrinth System. These changes in turn will register as HGN on SFSTs testing , (1,12).Law enforcement officers at the side of the road are not trained to and do not take a detailed medical history about childhood illness, past traumas and other medical problems when the individual is being judged for intoxication. The individual himself may not even be aware of these medical syndromes or has compensated for them, such that they present no problem for the person except when he is tested for HGN.

Neuroanatomical Structures and Neural Pathways

The Pons area of the Brain Stem connects many aspects of the Autonomic Nervous System and the Voluntary Nervous System. It receives and sends impulses from Labyrinth System of the inner ear, the Extra-Ocular Muscles, and the Ocular Cortex where what the eye actually sees register.

The Cerebellum connects to the Brain Stem, and is also part of the feedback system which receives input about nerve and muscle activity, and then modulates or counterbalances each muscle's contraction with its relaxation, the contraction of the others, etc. There are millions of nerves that connect and feed- back messages from the eyes, the Occulomotor muscles, the Cerebellum, the Inner Ear's Labyrinth System, and the Brain Stem. Interference with any of the neural pathways between these diverse parts of the head can cause HGN. Many factors, including vascular

problems, minor strokes, pressure from tumors, generalized demyelinating diseases such as Multiple Sclerosis, infections, and injuries from trauma to the head or neck affect these neural pathways and in turn their ability to send and receive data. Small bleeds (such as those caused by hypertension). small tumors, and even injuries (such as those caused by minor head trauma, from boxing, automobile or sporting accidents) can cause damage which will result in nystagmus, but would be unrelated to alcohol use. Which in the Defendants case would have been the cause since she was just hit from behind by a 18 wheeler and she had not been checked out by EMT prior to taking the HGN test. Cerebral palsy ,congenital cerebella problems, demyelinating diseases such as Multiple Sclerosis, Rheumatoid Arthritis and Parkinson's Disease, and even late onset inherited disease can also damage the cerebellum and cause a disruption in the feedback process, which will exaggerate normal nystagmus , and may be seen when tested for HGN.

Anything that interrupts or damages any part of this system, be it from infection (childhood or adulthood). including meningitis, encephalitis, an inner ear infection, or even high temperature seizures [1,4], can cause sufficient damage for an individual to have abnormal nystagmus , or HGN, although in most other aspects of an individual's functioning they are of little consequence.

Summary

The Standardized Field Sobriety Tests, which include the test of Horizontal Gaze Nystagmus (HGN), are used bylaw enforcement as if they were direct measures of blood alcohol content, initially at the 0.1 mg % level, now at the 0.08 mg % level and soon at the 0.05 mg % level. The assumption is that an individual who fails the test is intoxicated by definition, and the refusal to take a breath test is justification for mandatory loss of a driver's license in most states. In reality, Horizontal Gaze Nystagmus is an indirect and circumstantial estimate of

not only .but also the presence of alcohol, Blood Alcohol Content, as are all other Field Sobriety Tests. Nystagmus itself is a normal process. It can be exaggerated by the influence of alcohol and drugs. Nystagmus, however, can also be influenced by many other factors, including medication to help an individual function such as in the case of the Defendant who was prescribed Lithium , their past and present medical condition in the Defendant's case her Rhuematoid Arthritis , and the environment they are tested in. These other factors might cause a person to be judged intoxicated when they are not, and they are often ignored in SFST testing as in the case of the Defendant Nance. The process by which nystagmus occurs is a very complex feedback loop that involves neuroanatomical structures in the Brain. Inner Ear, Brain Stem, Rectus of the eye and Extra-Ocular muscles, as well as the millions of neural pathways that connect these structures. Factors that have in the past affected the individual's eyes, ears, and nervous system may exacerbate Nystagmus, and can cause an individual to fail the HGN part of the SFSTs. Moreover, the level at which a pointer is held to perform the test brings other muscles into play and invalidates the results.

According to NHTSA statistics, at least 20 to 30% of all individuals who fail the HGN test and refuse a breath test will not only unfairly lose their license, but also possibly suffer a wrongful DWI conviction, because their BAC would have been below the 0.08mg% level used to determine intoxication. They will therefore be arrested for skewed HGN probable cause, but are not intoxicated and should not have been arrested on the basis of the HGN test. They will have "false positives" and will be assumed guilty, rather than assumed innocent." The built in inaccuracy of these test may well be the reason the U.S. Department of Transportation continues to put the disclaimer on each new study they sponsor, stating: "The United States Government assumes no liability for the contents or use thereof." (15)

In summary the State did a "very sloppy" job of investigating the accident. They failed to get a search warrant and to they failed to fully investigate what really happened that night. What we have here is a case of a young woman who was hit from behind by a 18 wheeler who was free to go. He (the driver of the 18 wheeler) was never asked to perform any sort of field sobriety test unlike the Defendant even though he was the cause of the accident. The State used two nonstandardized tests that based on research have no probative value determining if someone is intoxicated. The State used a HGN test that based on research if certain medical disorders are in to play such as Arthritis or a person who has been prescribed Lithium as in the case of the Defendant those test are invalid as well. And finally you have a officer who asked the Defendant where she was headed and she told him "home" he assumed the Defendant was intoxicated because he was thinking she was lost when in all actuality she was trying to tell him she was headed home to Mount Pl easant where she is from. Which in her case would be "home' to her. Therefore because the State has the burden of evidence to prove BEYOND A REASONABLE DOUBT that the Defendant was intoxicated where in this case it is clearly obvious they have failed to do. The Defendant prays that this Court REVERSE the judgment and REMAND the case back to the trial court and render a judgment of acquittal. In the alternative, Appellant prays that the cause be remanded for a new trial or for further proceedings in accordance with the law of this Court's ruling.

## PRAYER FOR RELIEF

For the reasons set forth above, Appellant prays that this Court REVERSE the judgment and REMAND the case back to the trial court and render a judgment of acquittal. In the alternative, Appellant prays that the cause be remanded for a new trial or for further proceedings in accordance with the law and this Court's ruling.

**Respectfully submitted:**

Jessica Nance

P.O. Box 211362

Bedford, Texas 76095

214-650-4387

## CERTIFICATE OF COMPLIANCE

I certify that this document was prepared with Microsoft Word and that according to that program's word count function, the sections covered by Tex. R. App. P. 9.4(i) contains 10,028 words.

_Jessica Nance_

**JESSICA NANCE**　　　12/22/14

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to the following persons listed Jason A. Duff 2615 Lee Street PO Box 11 Greenville, Texas 75043, State of Texas Jeffery Kovach 2500 Lee Street, Greenville, Texas 75401, and the Sixth Court of Appeals 100 North State Line Ave. Ste. 20 Texarkana, Texas 75501.

Jessica Nance

**JESSICA NANCE** 12/22/14

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to the following persons listed Jason A. Duff 2615 Lee Street PO Box 11 Greenville, Texas 75043, State of Texas Jeffery Kovach 2500 Lee Street, Greenville, Texas 75401, and the Sixth Court of Appeals 100 North State Line Ave. Ste. 20 Texarkana, Texas 75501.

*Jessica Nance* 12/22/14

JESSICA NANCE

# EXHIBIT ONE

DECLARATION

I hereby declare that I am the deponent in the within matter; that I have read the foregoing examination under oath and know the contents thereof. And I declare that the same is true of my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of _____

19 , at _____.

_____
WITNESS

Page 61

I, Lori Raye, A Certified Shorthand Reporter for the State of California, do hereby certify:

That prior to being examined, MARCELLINE BURNS, Ph.D., the witness named in the foregoing examination under oath was by me duly sworn to testify the truth, the whole truth and nothing but the truth pursuant to Section No. 2093 of the Code of Civil Procedure;

That said examination under oath was taken before me, at the time and place therein set forth, and was taken down by me stenographically and thereafter transcribed;

I further certify that I am neither counsel for, nor related to, any party to said action, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name this 5th day of May 1998.

_____
LORI RAYE
CSR No. 7052

Page 62

with misguided pride that they've made the test a little more difficult, or changed it. I don't like to discourage hard-working police officers, but I have to say to them, "That's very interesting, and it may be that your test is better, but we don't know that. So please don't do it."

MR. BAIR: Maybe they're getting down to .06, which may be the next test.

THE WITNESS: If the American Medical Association and MADD has its way, we're going to .05.

BY MR. KAPSACK:

Q. The third test I think is where we were.

A. Third is the One-Leg Stand, and the suspect is told to stand with their feet together, to lift one leg, either one, approximately six inches off the ground, point the toe, watch their toe, their foot at all times, and to count.

Now, this is a place where NHTSA has made a change. Our instructions were -- I don't think it's a significant change, but just so you're aware of it, originally we said you count 1,001, 1,002, 1,003, until you reach 1,030.

We wanted to be sure they held that

Page 57

stance for 30 seconds because it turns out that people at .10 very often can hold it to 20 or 25 seconds. It's only when the attention begins to waiver that the balance gets messed up. So it's critical to hold it for 30 seconds, and that was the point of the counting.

NHTSA has just within the last couple years changed that instruction so that they're now told "Count 1,001, 1,002, 1,003, until I tell you to stop." And the officer now times it for 30 seconds and then records the count. In other words, if a person was at 25, they write down 25. And that's what they do.

Q. You had been giving us points before.

Do you recall the points on this one?

A. I believe it's two.

Q. Again, getting back to one of the broader themes, the person is supposed to hold their foot six inches off the ground, but the six inches isn't the key here?

A. No.

Q. It's holding it off the ground?

A. Correct.

Q. The officer should not be out there measuring whether it's five and a half or eight

Page 58

inches?

A. No. You have to give them some instruction. I mean, there's a difference between six inches and straight out. But if it's five and a half inches or seven inches, it's not going to make a difference in the test. I suppose there's some point like a fulcrum at which it's easier to balance, perhaps. I don't know. But the instructions are six inches, approximately six inches off the ground.

Q. In all these tests, again, common sense plays an important role. For instance, you know, for any of these tests, I would guess, standing on one leg came to my mind immediately if it's being done in a place where the highway goes in a mountain gap, and you've got 25-mile-an-hour winds. It's probably not the best place to give the test, and that's going to have some effect.

A. It might be difficult, but, you know, the field tests we did in Colorado, one of the things we were interested in was, are these tests valid in Colorado mountains where it snows and blows and does all kinds of unpleasant things? And we didn't find any significant effect of the weather, except that officers tended to make a

Page 59

mistake by letting people go who should have been arrested if they didn't have on adequate clothing. In other words, if it was cold and they didn't have a jacket, they tended to make an error by releasing them.

Q. By assuming some of the mistakes were as a result of being cold?

A. Either that, or they just felt sorry for them.

MR. BAIR: Didn't complete the tests?

THE WITNESS: Just didn't keep them -- that's the only thing I can assume. If officers make an error, it's far more likely to be a release than an arrest. They don't arrest very many incorrectly, but they release enough incorrectly that, as road users, we should worry.

MR. KAPSACK: I'd like to take a five-minute break.

(BRIEF RECESS)

MR. KAPSACK: That's all we have. Thank you.

Page 60

approximately 12 inches in front of their face, elevated slightly so they'll open their eyes. Because the point is, you have to see their eyes. Then he or she moves the stimulus — how shall I describe it? — back and forth in front of the eyes laterally and observes that individual's eyes.

First of all, the determination is made whether the eyes can track the stimulus smoothly, or whether they jerk as they move. I'm tempted to use my hands because I teach it. So lack of smooth pursuit is one sign. That's worth one point in each eye.

The second sign is the distinct jerking at maximum deviation. In other words, when the eyes have been moved as far as they can go to the side, and then held there for about four seconds, is there a distinct jerking, not just a little tremor? Because that can occur because it's an uncomfortable position. There needs to be a distinct jerking that persists.

And then finally, the person who is administering the test looks for the angle of gaze when there's the first onset of jerking. In other words, has the individual deviated his eyes 40

Page 53

degrees, 45 degrees or 30 degrees? Because it's the relationship between that and the BAC.

MR. BAIR: Each one of those is worth one point in each eye?

THE WITNESS: That's correct. So a maximum of six, and four points is a basis for taking them in.

The Walk-and-Turn test is just what it sounds like, a test of the individual's ability to walk and execute a turn and return. They're told to put the left foot on the line, put the right foot in front of it and stand in that position while the officer gives the rest of the instructions.

He then instructs and demonstrates by showing what heel-to-toe is. He tells the individuals, "I want you to take nine heel-to-toe steps along the line. Watch your feet at all times, leave your arms at your side, and count your steps aloud. When you get to the ninth step, turn around, take small steps turning around and come back along the line in the same way with nine heel-to-toe steps. Do you understand?"

And if the individual says "I don't understand," then the officer repeats the

Page 54

instructions. And there are eight — I believe there are eight errors that can be scored. Two errors are reason to arrest.

BY MR. KAPSACK:

Q. Let me interrupt you for a second here. We talked about this a little bit earlier.

You said they should take little steps, and we talked about how the officer has to use common sense.

A. He demonstrates that, by the way.

Q. Right.

I have seen this where the officer has prescribed that it must be a specific number of steps.

A. To turn around?

Q. To turn around. I have seen and heard them say "You must pivot on your foot using three steps to turn around."

A. I'm not aware of the source of that.

Q. This is part of the problem, little bits that have been added and taken away that have occurred in some places.

A. Let me say that I don't think that would do any harm unless he scored an error for failure to take three steps. If he wants them to

Page 55

take three steps, I don't think that's a big deal. But he has no basis to score against them for taking four because that's not part of the standardized testing.

Q. That gets back to your testimony before, because that's what gives it its reliability.

A. That's what gives it its predictive power.

Q. Predictive power?

A. "Reliability" means something different to me.

Q. I like that, "predictive power."

A. Yeah. What you're trying to do is predict accurately whether this person is going to have a breath test that shows above or below .10.

Q. If I, as an officer, score something as an error that's not considered an error under the standardized rules, then my power of predictability is not very good.

MR. BAIR: Or has been diminished.

BY MR. KAPSACK:

Q. Could be getting worse, because we've never studied that aspect.

A. Could be. Sometimes officers tell me

Page 56

recreate all the same variables in the laboratory that you have at roadside, which is one of the reasons I wanted to do a field study.

Q. And conversely, in the laboratory, you don't have some of the distractions that you would have on the roadside?

A. That's true.

Q. For instance, I would assume you kept the laboratory fairly well lit. It's not the kind of nighttime stop that officers get involved in.

A. True. Another important variable is that those officers had just been trained, with one exception, and that was in the second study. None of them had heard of Horizontal Gaze Nystagmus before. It takes a period of learning to believe what you really see for officers who are trained in nystagmus. So my concern, my interest was in finding what officers who had used the test battery for a period of time were capable.

(DISCUSSION HELD OFF THE RECORD)

BY MR. KAPSACK:

Q. There also must be a period of institutional learning for which most police departments are notoriously slow. When you talk about confidence, the officers had to have

Page 49

confidence when they came to you individually. I'm sure the first few times you told the officers, "You're going to take a stimulus and move it in front of their eyes," they must have looked at you like you were crazy.

A. I'm sure they did.

Q. But then when they went back to their departments and they said, "No, it really works," I'm sure the rest of the officers looked at them like they were crazy, too.

A. There is a period of accepting. Police officers are notorious for not accepting newfangled ideas, so to speak.

Q. When these tests are done on the side of the road, is there a set standard or a given margin that the officer should use regarding mistakes or failures in the field sobriety tests that he should attribute to the environment, if you understand me?

A. I understand you. I'm trying to think if there's any such thing.

The only thing that's required for nystagmus is that the suspect be able to see the stimulus and the officer be able to see his eyes. It doesn't matter if the wind is blowing or it's

Page 50

raining, you know. Those things just don't matter.

Walk-and-Turn, preferably, is done on a flat, dry surface. If it cannot be, then I think the officer is going to have to take that into account. But to my knowledge, there are no particular guidelines that -- there's been no research that says that if the pavement slopes X number of degrees, that cannot been done. But I don't think it would be possible to do it.

Again, I think it's a matter of common sense, but it has not been a matter of research.

MR. BAIR: Footwear would make a significant impact on a study with regard to the Walk-and-Turn.

THE WITNESS: It can, and I think it depends on the individual. Depending on where it is and the circumstances, officers very often give somebody who is wearing high heels or boots with heels the option of taking them off.

BY MR. KAPSACK:

Q. I would assume that Walk-and-Turn would be hard in a six-inch spike heel.

A. Unless you do every day, then it's a piece of cake.

Page 51

MR. BAIR: Tennis shoes may be difficult, then.

BY MR. KAPSACK:

Q. Have you ever been asked by NHTSA, or has there ever been a proposal that was requested regarding any of the other tests that have come and gone, such as, I believe the Hand-Pat was mentioned, or a written alphabet or anything like that that you know of that you've been involved in?

A. I've never been asked to do any research with those. It's possible -- I don't remember the report from the more recent study for the .08. They did use some other tests, but I don't remember now what they were.

MR. BAIR: I think I just would like to get down specifically what those three tests are. If you could, tell us the walk out nine steps, walk back, exactly what those tests are so that we have a record of exactly what those tests are that your group came to the conclusion were accurate.

THE WITNESS: Well, HGN, which is a jerking movement of the eyeballs, is administered by having the individual stand with their arms at their side, holding his or her head still, and the officer or person administering the test holds the stimulus

Page 52

Q. And that's 18 years ago.

What's the next?

A. Well, the next step is NHTSA's step, and I'm not really the person to tell you exactly what and how and why they did it, except as an outsider, to say that training began sometime thereafter of law enforcement nationwide.

Q. I take it throughout this you're still involved in it to a certain degree.

When is the next time you get a contract or do a study, or anything along those lines?

A. Well, the next time I actually worked for NHTSA that involved these tests was with a study of the Drug Recognition Program, of which these tests are a component, and that was in 1985. That's the only work I directly did for NHTSA, except to appear as an expert.

Q. Getting back to the tests themselves, why three? Is there any significance to why -- you've already told us you found that some of them were repetitive and things like that.

Can the officer make a reliable decision based on one test, or does he need all three?

Page 45

A. Okay. One of the reasons for three, coming at it from one direction, is officers don't have all night to do all the tests in the world out there. There is a limit as to the amount of time they can invest in any one stop. So the redundancy -- I can't justify the redundancy. If you're not getting more information, why do more tests?

Coming at it from the other direction, although Horizontal Gaze Nystagmus is almost as good alone a predictor as all three tests, it's kind of a maximum of testing, whether roadside or educational or psychological or medical testing, that if it's an important decision, you don't want to base it, unless you have to, unless circumstances force you to -- but you would prefer to have evidence from more than one test.

If you had very disparate results -- let's take another field. If you went to your physician and he had one test that said you have diabetes and another that said you have heart disease and another that said you have cancer, I think he would be a little puzzled. He would like to see all his markers, blood tests, EKG's, pointing in one direction to give him some

Page 46

confidence in his diagnosis.

So instead of saying, "Horizontal Gaze Nystagmus is a pretty good test and predictor; we'll just go with that," you really need more evidence, in my view. And I think that's a pretty widely held view.

So there were three, but as I said before, we found adding to that of those six that we identified didn't really improve predictions, so we didn't have four or five.

Q. And you don't have only one for the reasons you just stated, because you want a second opinion, you want a little backup there?

A. Well, there's always a risk if you rely on a single marker. Now, sometimes an officer may have to. The circumstances may be such that the only thing he can do is look at their eyes. But let's suppose you have somebody who has a real problem with balance because of some medical condition, or you have somebody who has really strange eyes for some reason that I don't know. But if that's the only test you have, you really don't have any basis for a decision.

Q. Now, initially when you did the experiments on these, they were done in the

Page 47

facilities where you have a somewhat controlled environment?

A. Absolutely.

Q. The overwhelming percentage, if not 100 percent of the time these tests are given on the side of the road, how much of a factor does that play?

A. That plays a factor that works -- well, there's a number of factors working here, and it works both ways. Certainly, in the controlled environment where there was no consequence to an officer's error, that had to affect the data. If you look at the data, you can see it did.

One of the things that I'm often challenged on is in the first experiment, they made a lot of false alarms. That is, they said this person is above .10 when, in fact, they weren't. If you look at the data as I did, you discover that their criterion was really .08. In other words, they were saying arrest at the point they saw significant impairment. That was .08, not .10. Their sergeants are not going to be upset and the lieutenant is not going to be upset if they make an error, and this person is not going back on the road driving impaired. So you can't

Page 48

believe we left off historically with your taking the original six through the experimental stages, and coming down with three.

A. Correct.

Q. And do you recall about when that was?

A. That report was submitted in June of 1977.

MR. BAIR: That was the '77 report?

THE WITNESS: Correct.

MR. BAIR: And you did a report in '81?

THE WITNESS: That was the follow-up contract that studied only the three.

BY MR. KAPSACK:

Q. So '77 comes, you've been submitting progress reports to NHTSA all along, but now you start with the ride-alongs and the reading, culling it down to 15, taking the 15 down to six, and the six to the experiment. Now you say, "These three are the three best, as far as we're concerned, that we recommend should be the standardized battery," NHTSA takes that and agrees with you?

A. I don't know if we used the word "recommend." What you do in the final report is you report everything you did. Everything. Who the subjects were, how you did the experiment, your

Page 41

data analysis. Then you reach some conclusions based on that set of work. Those conclusions were that those three tests were the best at discriminating between above and below .10.

Q. So now four years goes by.

A. Couple years. A year and a half, two years.

Q. Okay. I'm not going to ask you what NHTSA did, because you don't work for them so you don't know. But they turn around and say "We're soliciting proposals again," or something along those lines?

A. Yes.

Q. This time, it's for a follow-up study?

A. What the second study was to do was to do further research with the three tests to standardize them. In other words, to standardize them and develop the scoring and the administration procedures so that they would be as sensitive as you can make them. In other words, we have identified the best tests. Now let's make it the very best test battery we can make it.

Q. Some fine-tuning?

A. Some fine-tuning.

Q. Same type of thing, you submit your

Page 42

proposal and you get it?

A. Correct.

Q. You get the contract?

A. Correct.

Q. This was in what year, if you recall?

A. Well, the final report was in '81, which leads me to believe it would have been '79. I don't recall the exact date of the initiation, but it was, again, a two-and-a-half to three-year project.

Q. So you spent about a year and a half, two years analyzing data again, fine-tuning --

A. We ran a whole other experiment.

Q. You ran a whole other experiment? Okay. Same type of experiment you described before?

A. Very similar, except now we only use three tests, not six, but the design was similar. We brought ten police officers in, trained them how to do it in a standardized way, recruited subjects. Everything was double-blind.

One thing we did differently between the two and the one is that in the second study, we brought about 100 of the subjects back for a second session. The reason for that was to examine the

Page 43

reliability of the tests. "Reliability" being used here in the statistical sense. It's very similar, but has a very specific meaning.

If you bring the subjects back, produce the same BAC, have them examined again with the same tests, sometimes by the same officer, that's one kind of check. Sometimes by a different officer. Do you get the same results?

And you have to have two administrations of the test battery to the same person in order to do that. So that was an addition.

Also, we did a small field study. Not a good field study, not big enough. There were a lot of things that we didn't like about it, and reported that we didn't like it because there weren't funds to do it. That was the second.

Q. So you submit that report, or the report of all this in '81?

A. Correct.

Q. And you fine-tune the standardization?

A. Correct.

Q. And supplement your findings with the additional data?

A. This time we had 297 subjects.

Page 44

talking about here, has not changed.

Let me add that the drug recognition expert policeman uses five tests, and they include the Finger-to-Nose and the Romberg with a time estimation. There are very good reasons for doing that when you're looking for drugs because those two tests give you information with regard to drug symptoms that the others don't. But the standardized field sobriety tests have not changed.

BY MR. KAPSACK:

Q. I guess part of the question that I was picking up is, has there been any time that somebody said, "Hey, the officers in Alabama have just started doing this test, and they say it works really well"?

Have you had that kind of information come to you and had a chance to evaluate that? Has anybody said, "There's a new test that officers are using," and you say, "Let's put it in the lab and see if it works"?

A. No. First of all, I see a lot of road tests used by officers because I see arrest reports. But you have to understand when you're nonprofit research, you only do what somebody pays

Page 37

you to do. You don't have the luxury of doing anything else.

Q. I assume that you keep up to date in this field, keep abreast of any other studies that are going on regarding --

A. Field sobriety tests?

Q. Yes.

A. To my knowledge, there are not any others going on.

Q. Well, that was the follow-up question.

A. To my knowledge. It's possible that somebody somewhere is doing something, but I have no information about that.

Q. Obviously, some little sheriff's office somewhere could be doing their own experiment. But if it was a major type of thing, you would know about it?

A. Yes, I would. Let me add, there has been a revalidation or validation study for the .08. That was done by a research group called National Public Services Research Institute in Landover, Maryland. It was done two or three years ago. Essentially, they said, "Guess what? These are the best tests."

Page 38

Q. I know the answer, but we have to get it down for the reporter.

When you say "Guess what? These are the best tests," you mean the same three we've been talking about?

A. Correct.

Q. Now, these standardized tests were developed as an aid for officers to make an initial determination in the field as to initially whether or not the person had a blood alcohol level that was over .1; correct? That was the initial --

A. That's correct, .1 or above.

Q. These tests, in and of themselves, don't state whether the person is able to drive the vehicle. In other words, these tests show there is a likelihood that someone is over .1, and since the medical community is pretty much in agreement that over .1 means you're not capable of operating a motor vehicle reasonably under the law, at least, the tests can therefore be used for that, but directly, the tests don't show the ability or inability to operate a motor vehicle; correct?

A. Correct. What you're asking is, are these tests of driving? They are not. If they were tests of driving, they would be field driving

Page 39

tests. I can elaborate on the reasons and everything behind that if you want, but they are not tests of driving. They are tests of sobriety. There's a whole series of literature that tests alcohol and driving schools.

Q. That's the missing link, so to speak. The sobriety tests will tell you the probable level of alcohol, or at least the probable minimal level of alcohol, and then you go to the literature or the expert or the doctor to say what effect that level of alcohol will have on a person's mental and physical abilities regarding driving?

A. Well, the research over the years is what led the legislators to choose the levels that they did. And as the research accumulates, those levels keep coming down. The officer is not charged with making a decision about driving skills at roadside. He couldn't. There's no way you can judge somebody in five minutes at roadside that you never saw before to make a decision about their driving skills.

What he is charged with doing is making a judgment about their sobriety or presence of alcohol or impairment by alcohol, if you will.

Q. To fill in the blanks a little bit, I

Page 40

nine steps, et cetera, those are critical because the nature of the task requires them to assume the stance on the line, to stand in that position while they're given instructions, and the ability to understand and follow the instructions is part of the test.

So if they don't do that, that's important. And then whether or not the results have as much meaning as you would like them to becomes problematic.

Q. Let me see if I can bring this to a level that at least I understand.

For instance, nine steps is the standard on a Walk-and-Turn; correct?

A. Correct.

Q. If the officer tells the person to take only seven steps instead of nine, but the person falls off the line each and every time, it's not really important that he only had him do seven?

A. That's correct.

Q. But on the other hand, if the officer says "I want you to take 35 steps," and after 13 or 14 the guy steps off the line, that kind of deviation may mean that the officer's conclusion that the person is under the influence or over a

Page 33

certain level could be wrong because he's gone to the point that it could be fatigue or something else?

A. I think you got the meaning of it. I frequently hear, for example, a lot of argument in court about whether or not the stimulus for HGN was held exactly 12 inches in front of the person. We wrote into the instructions a distance as being a comfortable focal distance so that the person is not trying to focus too near and gets sick and throws up, or is so far you're not sure.

You know, whether it's 11 and a half or 13, I don't really care. But you have to give an instruction. In other words, hold the stimulus approximately 12 inches in front, up a little bit so you can see their eyes. You have to take these things in context.

MR. BAIR: But sort of also within reason?

THE WITNESS: That's correct. The instructions, as they're written, are written for a reason. You know, having them assume the position on the line while they listen to the instructions, that's an important component of the test. How the stimulus is held and how it's moved, those are all part of the test. But a slight deviation of the

Page 34

focal distance is not going to undermine the results.

BY MR. KAPSACK:

Q. Okay. These instructions that you talk about are the instructions that eventually found their way into the NHTSA manual?

A. Correct.

Q. Did you get an opportunity -- and I know we're jumping around a little bit, but did you get an opportunity to review the NHTSA manual before it was put into mass publication to make sure they didn't change any of the things you had told them along the way?

A. Again, yes and no. The first manual was sent to me, and I reviewed it, and there was at least one thing in the manual which I thought was an error and advised them of it. It was subsequently changed. But there have been subsequent editions, and I'm not sure that I have reviewed all of those, certainly not prior to their release. I may have eventually obtained a copy of all of them, but I didn't review them.

MR. BAIR: But, really, the conclusions from your first study, more or less, have remained the same? All of your additional studies have only

Page 35

served to compound those conclusions or to reinforce those conclusions?

THE WITNESS: There have been no substantive changes in the tests or the -- NHTSA developed the scoring; I didn't. There have been some slight changes. NHTSA made some slight changes in instructions that differ from what we did. Again, I don't think they're substantive, and I don't think they matter.

MR. BAIR: Have you done any tests regarding the effectiveness of, like, the Hand-Pat test as a method of testing the sobriety of the driver?

THE WITNESS: Unless the Hand-Pat was part of that original series that we pilot tested, the answer is no. I don't remember if it was in that, but we didn't use it in either of the main experiments.

MR. BAIR: So over the years, I guess, like law enforcement has developed certain kinds of tests, have you added any of them in and tested their efficacy, or have you continued to stick with the three that you originally determined to be the most accurate?

THE WITNESS: Standardized field sobriety testing, which includes the three tests we're

Page 36

to why it was left behind, so to speak?

A. It was a sensitive test, as I recall, but it just wasn't quite as good as the ones we recommended. The analysis didn't show it to improve the overall correlation with BAC, either.

Q. And the other one was Finger Count?

A. Right. Same answer.

Q. Same thing, okay.

Getting back to something you said, when the officers first came in and you trained them, this was the first time they had really experienced a standardized format.

Is that important?

A. The standardized?

Q. Standardization, is that an important factor?

A. Yes, it is.

Q. How important? Is it critical, fatal, sort of important?

A. Well, if the tests are going to have meaning as objective measures, they have to be administered in a standardized way.

If Officer A — let's use Walk-and-Turn, for example.

If officer A uses 10 steps down and 12

Page 29

steps back, there's nothing inherently wrong with that, and it may give him a good idea whether he's looking at an impairment or not, but it's not the standardized instructions. Therefore, the scoring and the observations don't relate to any of the research data or any of the accumulated data over the years. So it's not that the officer hasn't gained any information; he doesn't have the same base to refer it to if he changes it.

Q. So it's almost as if he's creating a new test because he doesn't have the scientific data to back it up on?

A. Well, he's just not doing it in a standardized way. "Standardized" means everybody is going to do it the same way every time. So if it's used in Seattle or Miami, it's going to be used in the same way and it's going to be subject to the same interpretation and it's going to have the same meaning when you get into court with it.

Q. When you say "meaning," you mean as far as reliability or accuracy?

A. I mean both.

Q. I think I understand.

So if it's given according to the standardized criteria, then the conclusions that

Page 30

come from it or the data that's collected from that individual can be related to the data that you've compiled over the years because the officer who gave it in that particular case did it the way it's always been done in the experimental situations, correct?

A. In the experimental situation and in the field situation, because now we have accumulated a lot of years of experience.

Q. Okay. Is there any way that you can adjust for deviation from the standard? For instance, let's just say, speaking generally, that there's a test that the standardized format requires the officer to do five things or asks the individual to do five things, but the officer only does four of those so the officer actually gave 80 percent standardization.

Can you correlate that back to the data? Can you say, "Since the officer was only 80 percent standardized, I should adjust the final result," or does it mean the final result really has no backing?

A. Neither of the above.

Q. Okay.

A. I would not try to adjust it by any

Page .

percentage. But whether or not it has any meaning kind of depends on what the deviation was. Let me give you an example.

I once saw an officer taken to task, and that's all I'll say about that because he used the word "pivot" for the Walk-and-Turn. In other words, he said, "You take nine heel-toe steps, counting out loud, leave your arms to the side, watch your step, and when you get to the ninth step, pivot on that step and return in the same manner." The argument being that's not the right word, and you should tell him to turn around by taking small steps. I don't think that makes much difference.

There are things that make a difference; there are things that don't make a difference. And I really think you'd have to evaluate it. Some of the things that people get upset about don't make much difference. I mean, use a little common sense. The word "pivot," in my mind, is not a world-shaking error. There are other things that are more distressing.

If you don't give the instructions properly, you don't tell them to leave their arms at their side, count their steps out loud, take

Page 32

person was above or below .10, which was the statute in California at that time, and whether in the real world, this person would be subject to arrest.

Q. And again, obviously, this was not the type of thing that was done in one weekend or two, but must have stretched out over some time?

A. It did. I don't recall exactly how long. As I said, because it completely took over our facility to have all these people in our facility, we did it on weekends, Saturdays and Sundays. We had two police officers per day, and as I recall, about 15 to 20 subjects, and we ran a total of 238. So it took a while.

Q. Again, you've already mentioned double-blind and the fact that the officers did not see the drinking, so you followed appropriate scientific measures for the experiment.

A. We did.

Q. Again, out of everybody who was working on the experiment throughout any of these tests, the standard field sobriety tests or the six that you were evaluating, nobody did it based on any whim, it was all based on pure numbers?

A. Correct.

Page 25

Q. Did you drop any of the six along the way, or did you wait for the entire experiment to be finished to look at the data?

A. All of the subjects had at least five tests. At this time, I don't remember how we administered the Paper-and-Pencil test, whether it was just people who had some problem with balance. I suspect we administered it to everybody, but I truthfully don't recall without looking it up. But everybody had the complete set of tests.

Q. Then this experimental portion comes to an end, and I guess that's where your hard work really starts is you sit down and look at the data and analyze the data; right?

A. Correct. It's not the hard part. It's the fun part.

Q. Personally, I would have thought the fun part would have been going to hit the drinks.

A. That's the difference between attorneys and research people. We like math.

Q. The only math most attorneys like is 33 and 40 percent.

A. I've found that out.

Q. So you crunch the numbers, and you make a determination that you should -- well, let

Page 26

me ask you.

What happens next, do you determine that three of these are not valid or more valid or what? Where do you go next?

A. Well, once the data is collected, then we do the statistical analysis, and you probably don't want to know about this, but we did things like step-wise linear regression where you put some in and take some out to see which works best.

I did canonical correlation, which shows you how you best separate above and below, which tests do that best. I did discriminant function. All of these are very sophisticated and are done by computer. You don't crunch them on your calculator. They're very sophisticated statistical methods for what we needed to do, which is not just the best test but the best combination.

It's fairly complex, because one might be the best test, and two might be the second best test, but if one and two are measuring the same kind of thing, you might actually have a better test by taking one and then the third one. So you need to configure the battery as a whole, that best discriminates the above and below .10.

Page 27

In fact, what the analysis showed us is that balance is a good measure, walking is a good measure, but if you've already measured balance, you don't gain much by measuring it again. So although Romberg, which was one of our alternates, is a very good test, an excellent test, if you're going to use the One-Leg Stand, you don't really gain enough by doing another balance test to include it. It doesn't mean it's a bad test. It's a good test. But you have not gained anything by adding -- you have not harmed anything, but you've taken up more time.

Q. Right. It's repetitive?

A. It's repetitive. So the final configuration were the three best tests in total for making this discrimination.

Q. Okay. You described the three other tests, and we'll skip the Paper-and-Pencil test because we don't remember it too well, and I've never even heard of it before today.

You described the Finger-to-Nose test or Touch-the-Nose test.

Was that repetitive of one of the other tests, or was it found not to be an accurate test, or was there just a better configuration as

Page 28

A. I looked at the final report for the research contract.

Q. Okay. So you come out of the pilot program with these six tests?

A. Correct.

Q. You send a report regarding that to NHTSA; is that correct?

A. I'm sure the results of the pilot were reported in a progress report. I no longer have that. Based on the pilot work, we then said, "We propose to do the experiment with these six tests," and then proceeded to do so.

Q. Is this still under NHTSA? Is this who you're still answering to for the federal government?

A. I don't know what that question means. I don't answer to the federal government.

MR. BAIR: Are they the agency that employed you to conduct the study, NHTSA?

THE WITNESS: We were under contract to them, yes.

BY MR. KAPSACK:

Q. And it hasn't changed to a different organization? This is --

A. During this research?

Q. Right.

A. No, it was always NHTSA.

Q. I wanted to make sure we were clear on that, and the CIA didn't come in and say "We're taking over this project."

A. No.

Q. So in the report, you suggest to NHTSA that you be allowed to use these six tests to take into the field or into the laboratory?

A. Yes. Although I don't have those progress reports, I'm sure what happened was at the end of the pilot study, in our progress report, we reported the findings on the pilot studies, reported the six that we expected to examine and experiment, and undoubtedly detailed how we were going to conduct the experiment.

Q. Then I would take it that you got the official go-ahead.

A. I'm sure we did.

Q. Because you went ahead?

A. We went ahead.

Q. Okay. So now you go ahead with these six tests?

A. Right.

Q. And you said that these are the ones

you were going to use as experiments.

Q. Can you tell us what you mean by "experiment"? This isn't like a chemistry thing.

A. I can describe exactly what we did.

Q. Sure.

A. We recruited the human subjects for the study. The qualifications for this particular study were that they had to be licensed drivers and they had to be willing to drink alcohol. Other than that -- because we wanted to recruit a cross-section of the driving population such that police officers were going to encounter at roadside.

By random procedures, we assigned them, unknown to them, to various alcohol conditions. There were more people at zero -- even though they drank a beverage, who were at zero because otherwise, we would have created the expectation to the officer that every other one or every third one is going to be under the influence, and we didn't want to do that. So an officer on a given day might see six people on the road who had had no alcohol. The actual range of BAC's was zero to .15.

We recruited ten police officers from

law enforcement agencies in and around Los Angeles, and brought them in for one session which was about four hours long, and we trained them on how we wanted them to administer these six tests. In other words, "You do it this way; not creative, not inventive; you do it this way." But it was a short training, and given that police officers had not had any experience with standardized testing methods, I feel fairly confident saying they hadn't developed any particular confidence themselves in what they were doing.

Nonetheless, we brought them in two at the time on weekend days. We brought in, as I recall, about 15 to 20 people for drinking sessions. The officers didn't see the people during the drinking period. They were segregated. They had no contact with them until they reached their peak BAC, measured via breath instrument, and they were introduced into the room. At that point, the officer could ask questions.

We had one of our staff in the room as well to observe everything that was going on. He could ask them the kinds of things he asked them at roadside, then administered the test, and then he had to record a decision whether he believed that

**Page 17**

Q. As you said before, you weren't just -- let me back up.

We're saying "you." You weren't alone in this project, were you?

A. No, I was the project director on the first experiment. My colleague, Herbert Moskowitz, was also involved in that one.

Q. So we're using the plural "you," so to speak.

A. Right.

Q. You weren't given the money and cut loose, and the feds said, "Give us a report in two years"; they were watching you, expecting regular reports back?

A. That's correct. Part of your contractual agreement is that you report your progress on a monthly basis.

Q. This may be hard for you to recall, and if you don't recall that's fine.

At any time during this process, did the agency or department, whoever was overseeing you for the federal government, besides accepting reports or anything else, ever come in and say "Wait a minute," or "Look at this," or direct you in any way, or were you pretty much allowed to

**Page 18**

focus on what you felt was scientifically correct?

A. I don't recall any instance of them taking exception to anything that we reported and saying "We don't agree with this," or "Take another look," no. We're very good research people, so that's not something that happens to us.

Q. Plus it must have been a little bit hard for anybody, since you're the first ones going down the path, to say "You're not going the right way"?

A. That's true and not true. There was another large-scale project going on in Finland slightly before this. I didn't know about it early on, and so I don't know if NHTSA knew about it. But in fact, there had been a pretty good and rather extensive study that was done differently than what we did because they did it retrospectively by looking at records. But interestingly enough, they came to the same conclusions independently.

Q. So you're at this project for a couple years, and your file report -- I don't know what the right word is. I don't want to say culls or whittles, but you develop the position that the three best tests are the tests that you mentioned

**Page 19**

before, Horizontal Gaze Nystagmus, Walk-and-Turn and One-Leg Stand?

A. That's correct, based on the statistical analysis of that first experiment.

Q. Again, it's not based on any whim or anything; this is what the numbers show?

A. Absolutely.

Q. So you give the final blue ribbon report, all typed on the right-size pages with the right margins that the federal government always wants, tape instead of staples so no one cuts their fingers, and you give it to NHTSA?

A. That's correct.

Q. And now, NHTSA, it's my understanding, put it together in a training manual; correct?

A. Not yet. There's another process.

Q. Okay. Go ahead. What happens next?

A. Well, understand that the first experiment we were examining -- not we. Police officers were examining subjects who had zero to .15 BAC in a double-blind designed experiment with six tests. We had come out of the pilot experiment with six tests that we believed might work at roadside.

Q. Let me interrupt for a minute.

**Page 20**

Could you please tell us what the other three tests were? I'm assuming that three of them are the ones that we've been talking about, and there were three more?

A. Correct. I'll probably have to look at my report.

One of them was the Paper-and-Pencil test. We wanted very much to find something to use when the person says, "But I have a bad leg --" or whatever -- "and can't do balance tests." So we had Paper-and-Pencil actually, a couple. We had one and an alternate. Neither one of them proved workable. All of the other tests had some level of accuracy.

What we did was take the best ones. Let me -- one of them was the Finger-to-Nose. I'll tell you what the other one was. Finger Count, I think. Correct, Finger Count. So there were the three tests that we finally recommended for the test battery, Finger-to-Nose, Finger Count and Paper-and-Pencil test.

Q. Just so we're clear, given that it was 20-some-odd years ago, you had to refresh your recollection.

Could you tell us what you looked at?

exposition, but that's kind of the history of --

Q. My question was, during your initial ride-alongs and stuff, did you see that there were certain tests that really were sort of folklorish, and wonder whether or not they had any basis to aid the officer in the decision you just talked about?

For instance, before we started the deposition, I mentioned there was one place where they said they had stopped people and made them recite the alphabet backwards, and that had absolutely no connection.

Did you discover, in either some of the tests that you didn't include in your group of 15, or later on, that there were certain tests where people or officers or the community thought, hey, this is a good test to give somebody as an indication, but it turns out it really wasn't a good test?

A. Well, certainly, I observed tests that didn't make the cut. Where those tests -- you characterized them as folklorish. I don't know where they came from. Since there had been no research in this area, since there had not been a big emphasis on alcohol enforcement, I don't know, but I would suspect they just developed what they

Page 13

found to help them. Because at that point, there was no research on the validity and reliability of these things. But yes, there were tests being used in 1975 which did not make it into the first experiment.

Q. Okay. Now, after your initial reading of the literature and some of your ride-alongs, you've culled down to a group of 15. Then you said shortly after moving it into the lab, some of those were cut out for economic reasons or just practicality reasons, like you said, the officer not having the time or equipment, or not being safe to conduct some of these tests on the side of the road, which is the environment the officer finds himself in; correct?

A. Not quite. Those issues are all constraints at roadside. But the reason some of those tests were eliminated in pilot studies could be one of several. Either they weren't sensitive to alcohol, they didn't discriminate between above and below .10, or they were not suitable for certain ages or certain conditions. There were a variety of reasons why they just wouldn't work.

Q. Didn't make the grade?

A. Didn't make the grade.

Page 14

Q. Let me back up a little bit.

Obviously, you didn't jump from a huge number, from 15 to 3. It must have been different stages along the way.

About how long did that process take?

A. You're talking about almost 25 years ago. I don't know.

Q. Okay. I understand.

A. The research began in '75. A final report was issued in June of '77. I did all the traveling, the literature review and the pilot test before we actually began the experiment. So I would guess it was probably three or four months, but I don't recall.

Q. So obviously, it wasn't a hasty, overnight decision. It went through the stages you just described, the initial reading and observation by yourself, and then some pilot studies?

A. Yes. And when you perform research for the federal government for agencies, they don't just give you the money and walk away and say "Let me know when you get finished." There is an overview process. So you're making monthly progress reports to them, and they're part of the decision process and part of the evolvement of what

Page 15

you actually do.

So if I had said, just arbitrarily, "Well, I don't like these, and I like these," I would have been called on that. So it's a rigorous process.

Q. Thank you. That was exactly the question I was trying to get to and I didn't hit it quite right, but your answer did.

So you didn't say, "I don't like this test, I'm not going to bother with it"; if a test appeared to be a test that was going to make the grade, it stayed in whether you liked it or not, and if it appeared it wasn't going to make the grade, it got dumped by the wayside whether you liked it or not; correct?

A. That's very accurate. Whether I liked it or didn't like it, I don't remember having any strong feelings one way or the other. But in research, numbers are what make the decisions, not your subjective evaluations.

Q. To state the obvious, because that's part of the reason why we're here, this was all done in what is considered scientifically acceptable means; correct, all these testings?

A. That's correct.

Page 16

Q. More than 100?

A. Well, if you include hearings as being testimony, it probably would not be more than 100. I don't know. I have no idea.

Q. The times that you have testified either at trials or hearings, have you been admitted as an expert --

A. Yes.

Q. -- regarding standardized field sobriety tests?

A. Yes.

Q. Subsequent to your study, were the three standardized field sobriety tests adopted by NHTSA?

A. I don't know that NHTSA uses the word "adopted." What they did is they took the findings that we reported to them. They also took our data, our actual data set, and one of their staff, a man named Schweitz, did some additional analysis. Ultimately, they produced a training manual and began to sponsor training.

Now, I've told you about all I know about that because I don't work for NHTSA, except as a researcher. So I'm not really privy to all those processes.

Page 9

Q. Going back to 1975, shortly after you get the go-ahead and the funding to start the research in this area, did you start with the idea that there were these three tests, Horizontal Gaze Nystagmus, Walk-and-Turn and One-Leg Stand, that you were going to evaluate, or did you look at a broader base of tests that were currently being used or talked about in the field?

A. Neither.

Q. Okay.

A. Any research project -- well, that's a pretty broad statement. I began a project with the literature reviewed to find out what the state of knowledge was concerning that topic at that time. That was the first thing I did.

The second thing I did was went around various places in the United States and rode with DUI teams, special enforcement teams to actually determine what it was that they were doing.

Then finally, we compiled a fairly long list of tests. I think there were on the order of 15 to 20 that we thought might work. We did some pilot testing with them. It soon became evident that given the constraints at roadside, the time, variability and circumstances, the weather,

Page 10

the wide-ranging skills of the people you're dealing with, all of those things, plus you're dealing with the fact of what the squad cars don't have -- they already have too much, and we couldn't suggest adding apparatus on the basis of both cost and just practicality.

We had to think about officer safety, what they could do, and all those things eliminated most of the potential tests. We ended with six that we believed had some merit, and then conducted the first laboratory study with those.

Q. Regarding the initial list of 15 tests, you eliminated some of those based on a variety of reasons.

Were there any tests at that time that were being given by officers which, although they may have been given in that particular jurisdiction for a long time, really had no basis in science, no viability? In other words, they really didn't relate to what the officers were investigating?

A. I'm not sure I know how to answer that.

What officers were doing in 1975 was -- there was a lot of variability between agencies, even between officers and even between

Page 11

one arrest and the next. "Standardized" was not a word that had entered law enforcement in 1975. I think they were doing the best they could.

I've been puzzled about this for a long time, that since the automobile was introduced around the turn of the century, it was recognized that alcohol and driving weren't going to combine very well, if you look at the literature. Why had there been nothing done? The first statute with a number, which happened to be .15, was enacted in Indiana fairly early on. I don't remember the exact date. I have to look it up. So I was really puzzled about why nobody thought about how the officers were going to enforce these statutes.

If you think about it, if you're talking about .15, you're talking about a visibly, obviously intoxicated person. Probably they didn't need a lot of help at that point. But when it switched from thinking about drunk drivers to thinking about impaired drivers, which is what the scientific literature was moving toward, then it became clear that officers need some help in being able to recognize the signs and symptoms associated with impairment by alcohol.

I forgot why I got onto that long

Page 12

A. I am.

Q. Is there any need for me to go over them with you?

A. No.

Q. Obviously, at the end of this, you'll receive a copy of the transcript. If you need to make any changes, you'll have an opportunity to do so.

A. Okay.

Q. I have here what will be marked as Exhibit 1, a copy of your CV that you gave me today.

Is this an accurate and up-to-date copy of your CV?

A. It is.

Q. I'm not going to go into it in any depth.

(THE DOCUMENT REFERRED TO WAS MARKED BY THE REPORTER AS EXHIBIT 1 FOR IDENTIFICATION AND IS ATTACHED HERETO)

BY MR. KAPSACK:

Q. We're here today to discuss standardized field sobriety tests.

Are you familiar with that subject?

A. I am.

Q. Could you tell us briefly how it is that you know about standardized field sobriety tests, outside of maybe saying it's something that your father knew and his father before him knew.

A. Well, I'm one of the founders of and the current director of the Southern California Research Institute. That's a nonprofit research group. We're funded by grants and contracts.

I don't know how much you know about that process, but contracts are issued when the government agency identifies an area of research that they think needs to be done, and they issue a request for proposal. Any research group that believes they are competent to do that work can respond with a cost proposal and technical proposal.

In 1975, the National Highway Traffic Safety Administration, NHTSA, realized that the -- this is my understanding of what led to the request for proposals. They recognized that the average blood alcohol concentration of arrests nationwide was .17 percent BAC.

The prevailing statute was .10 percent. There may have been one or two that still had a high one, but most of the states had gone to .10. If the average arrest is .17, that means that a lot of people who probably ought to go to jail are not doing so because the officer is either not detecting the driving pattern that leads him to stop the vehicle, or once he stops a vehicle, he's not recognizing the presence of alcohol.

The National Highway Safety Administration actually funded several research contracts, but the RFP that we responded to was specifically to develop a battery of tests that police officers could use at roadside that would help them to make the correct decision so that it is a competitive bidding process.

Our bid, both the technical proposal which outlines how to expect to do it, what your expertise is, so forth, and our cost proposal won that award, and we began that research in 1975. The final report was submitted in 1977, and it was in that report that we recommended the three tests, Horizontal Gaze Nystagmus, Walk-and-Turn and One-Leg Stand.

Based on that recommendation, they subsequently issued a second contract to us to do a second study with just those three tests, and that one was completed in 1981. So that's how I got into this area.

Q. Okay. Your background information regarding your ability to get into this area, your expertise, et cetera, is covered in your CV; correct?

A. Yes and no.

Q. Okay.

A. At that time, I had several years' background in studying the effects of alcohol and other drugs. I didn't have any background in roadside tests, nor do I think anybody in this country did at that time. It's not a research topic that has gotten a lot of attention worldwide.

Q. Okay. I forgot to ask this in the beginning, so I'll ask it now.

Have you testified in court previously regarding standardized field sobriety tests?

A. Yes.

Q. Can you give us a ballpark figure as to the number of times?

A. No, not really. Not an accurate one. A lot of times, but I have no idea how many.

Q. More than ten?

A. Yes.

IN RE:

EXAMINATION UNDER OATH

OF

) Pages 1 - 62

MARCELLINE BURNS

EXAMINATION UNDER OATH OF MARCELLINE BURNS, Ph.D.

TAKEN ON

FRIDAY, APRIL 17, 1998

REPORTED BY:  LORI RAYE

CSR NO. 7052

Page 1

INDEX

WITNESS

MARCELLINE BURNS, Ph.D.

EXAMINATION                                    PAGE

BY MR. KAPSACK  .............................    4

EXHIBITS

NO.                DESCRIPTION              PAGE

1      Curriculum Vitae of Marcelline          5
       Burns, Ph.D.

Page 3

Examination Under Oath of MARCELLINE BURNS,
Ph.D., taken at 12400 Wilshire Boulevard,
Suite 1300, Los Angeles, California, on Friday,
April 17, 1998, at 12:15 p.m., before Lori Raye,
CSR No. 7052, pursuant to notice.

APPEARANCES:

FOR ROBERT SOHN:

    KAPSACK & BAIR, LLP
    BY:  BRUCE KAPSACK, ESQ.
         HUDSON BAIR, ESQ.
    353 Sacramento Street
    Suite 1500
    San Francisco, California  94111
    (415) 421-1021

Page 2

LOS ANGELES, CALIFORNIA, FRIDAY, APRIL 17, 1998

12:20 p.m.

MARCELLINE BURNS, Ph.D.,
HAVING BEEN FIRST DULY SWORN, WAS
EXAMINED AND TESTIFIED AS FOLLOWS:

EXAMINATION

BY MR. KAPSACK:
Q.   Could you please state your name and
spell your last name for the record.
A.   My name is Marcelline Burns,
B-u-r-n-s.
Q.   And it's Dr. Burns; correct?
A.   Correct.
Q.   Have you had your deposition or
examination under oath taken in the past,
Dr. Burns?
A.   I have.
Q.   On more than a couple of occasions?
A.   Yes.
Q.   So you're familiar with the rules of
depositions?

Page 4

BRENNER
BOX 213362
PED TX 7668



7014 2120 0004 5405 5327

CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

7014 2120 0004 5405 5327



UNITED STATES
POSTAL SERVICE

1000

75501

U.S. POSTAGE
PAID
BEDFORD, TX
DEC 76021
AMOUNT

$6.68
0004661 7-07

Sixth Court of Appeals
FrankNeel
100 North State Line Ave, Ste 20
Texarkana, TX 75501